1 | DURIE TANGRI LLP
  | RAGESH K. TANGRI (SBN 159477)
2 | rtangri@durietangri.com
  | MICHAEL H. PAGE (SBN 154913)
3 | mpage@durietangri.com
  | JOSHUA H. LERNER (SBN 220755)
4 | jlerner@durietangri.com
  | JOHANNA CALABRIA (SBN 226222)
5 | jcalabria@durietangri.com
  | ADAM R. BRAUSA (SBN 298754)
6 | abrausa@durietangri.com
  | 217 Leidesdorff Street
7 | San Francisco, CA 94111
  | Telephone:   415-362-6666
8 | Facsimile:   415-236-6300

9 | Attorneys for Plaintiff
  | BLACKBIRD TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| BLACKBIRD TECHNOLOGIES, INC., | Case No. 5:15-cv-04272-EJD |
|---|---|
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PRATEEK JOSHI, | Ctrm:  4, 5th Floor |
| Defendant. | Judge: Honorable Edward J. Davila |

FIRST AMENDED COMPLAINT / CASE NO. 5:15-cv-04272-EJD

Plaintiff Blackbird Technologies, Inc. ("Blackbird") alleges as follows:

**INTRODUCTION**

1.     This case involves a young company's nightmare:  an employee secretly breaches his common law, statutory, and contractual duties by starting up a competing venture on his employer's dime; the employee does work on exactly the same technology that he is supposed to be working on for his employer (or simply takes the technology) but does not disclose the side job; and then—when the employee's work does not measure up—the employee takes advantage of the employer's trust and good will in order to secure a salary for two more months.

2.     Blackbird was founded in 2013 by Majunath Rajashekhar and Nikhil Raghavan, Stanford graduates who have worked at some of the best-known technology companies, including Twitter and Oracle.  Blackbird has come up with a solution in perhaps the most competitive market in the modern economy:  ecommerce search.  Blackbird's technology enables a business to provide customers with search results that fit the customer's precise query.  For example, if the user searches for white shoes with black heels, that is exactly what comes back (not white shoes and black high heels).  This technology enables businesses to increase conversion rates, i.e., the percentage of user searches that result in sales.  As a result, Blackbird, which has done no marketing in mainstream media, already has millions of dollars in funding, and customers that pay more than six figures per year for Blackbird's technology.  Blackbird also has attracted top engineers, including engineers who played significant roles in Stanford's self-driving car program and MIT's robotics program.  The company now has nine employees.

3.     Defendant Prateek Joshi was a software engineer at Blackbird.  He was hired to work on computer vision engineering, which involves building image recognition capabilities to detect different attributes of products and categorizing those attributes in a taxonomy from web-based and mobile catalogues.  Defendant was paid an annual six-figure salary.  Defendant reported directly to Mr. Rajashekhar, the Chief Technology Officer ("CTO").

4.     Defendant signed a Proprietary Information and Invention Agreement ("PIIA") stating that:  he would not to start a competing business while employed by Blackbird; he would disclose any work he was doing that related to Blackbird's business; and he would keep Blackbird's technology and

business plans in confidence.

5. Notwithstanding the benefits he received from Blackbird, Defendant violated his common law, statutory, and contractual obligations to Blackbird. First, while still employed by Blackbird, Defendant started a business called Deep Lambda that touted exactly the same technology that Defendant was working on for Blackbird. Defendant never disclosed this to Blackbird.

6. Additionally, while still employed by Blackbird, Defendant uploaded a YouTube video with his new venture's logo and purported to have come up with precisely the same technology that he was working on for Blackbird. Again, Defendant did not disclose this to Blackbird.

7. Then, when Defendant's work did not measure up, Blackbird notified him that his employment would be terminated. Defendant asked to remain an employee—and to continue to receive a reduced salary (still in six figures) and benefits—for two months so he could, among other things, address immigration issues. Even though it had no obligation to do so, Blackbird agreed. The parties also agreed to release claims, but the release required that Defendant remain bound by the PIIA, incorporated the PIIA, required Defendant to return all Blackbird property, and required Defendant to comply with Blackbird's policies and procedures. Defendant's breaches rendered Blackbird's release of claims against him void. Not surprisingly, Blackbird would never have agreed to any release had it known that Defendant was violating his obligations to Blackbird.

8. When he left Blackbird, Defendant left with a copy of Blackbird's source code and related training assets, which Defendant had downloaded more than once. He also left with the code that he was working on for his competing venture, which he wrote at least in part on a Blackbird computer. Again, Defendant disclosed none of this. Defendant now claims that the source code was part of a "routine" backup even though Blackbird's code does not "routinely" back up to anyone's computer. Defendant also claims that his new venture, PlutoSearch, did not start using the code that he wrote while employed by Blackbird until March 2015. Even if true, that does not excuse Defendant's misconduct described herein.

9. To date Defendant, one of the two directors at PlutoSearch, has refused to produce PlutoSearch's code. He now claims that he cannot produce the code because after this lawsuit was filed he and the other director passed a resolution saying that he could not access the code.

2
FIRST AMENDED COMPLAINT / CASE NO. 5:15-cv-04272-EJD

10. Defendant also covered his tracks after he left Blackbird. On his LinkedIn biography, Defendant did not disclose the name of his new venture. Defendant even asked Mr. Raghavan for a recommendation to support his Visa application. Defendant then launched a website under a new name—Pluto Search—and began offering exactly the same services that he was working on for Blackbird.

11. As a result of Defendant's actions, there is a present danger to the years of hard work and millions of dollars invested in Blackbird. Therefore, Blackbird files this complaint.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 for Blackbird's claim under the Copyright Act, 17 U.S.C. §§ 501 *et seq*. This Court has supplemental jurisdiction over Blackbird's claims arising under the laws of the State of California under 28 U.S.C. § 1367 because they are so related to Blackbird's federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

13. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant Prateek Joshi resides in this district and consented to venue by removing Blackbird's claims brought in state court to this federal court.

14. The Court has personal jurisdiction over Defendant Prateek Joshi because he resides in California, engaged in the misconduct forming the basis for Blackbird's claims in California, has substantial, continuous, and systematic contacts with California, and has consented to jurisdiction in this district by removing Blackbird's claims brought in state court to this federal court.

**INTRADISTRICT ASSIGNMENT**

15. Defendant removed this case from state court to federal court on the grounds that it involved questions of federal Copyright Law. Pursuant to Local Civil Rule 3-2, upon removal, this action was subject to assignment on a district-wide basis and was assigned to this district.

**THE PARTIES**

16. Plaintiff Blackbird is a Delaware Corporation with its principal place of business in Menlo Park, California.

17. Defendant Prateek Joshi is an individual who, on information and belief, resides in Santa

Clara County, California.

## FACTUAL ALLEGATIONS

### Blackbird's Business

18. Blackbird provides visual semantic search, recommendation, personalization, and analytics technology for ecommerce companies. Blackbird's technology differs from other options on the market. Unlike traditional approaches, like keyword searching, Blackbird's technology understands intentionality, semantics, and meaning. Blackbird accomplishes this by using image recognition of products and artificial intelligence to understand associated text and queries. In order to make this work, Blackbird's technology uses, among other things, traditional feature-based machine learning (i.e., teaching the computer what a cat looks like) and neural networks trained with data from customers and public commerce sites.

19. What does all this mean in simple terms? It means that when you are shopping for something, Blackbird's technology highly precise search results. To give one example, if you search Amazon for a dress with a red belt, the results include red belts, but no dresses with red belts:



1  (*available at* http://www.amazon.com/s/ref=nb_sb_noss?url=search-alias%3Daps&field-
2  keywords=dresses+with+red+belts).

3  20. Blackbird's technology is aimed at returning only exactly what you searched for, i.e., a
4  red desk. Blackbird's founders and the employees who since joined them spent more than two years
5  developing this software. Again, the value of Blackbird's technology has not gone unnoted. Even
6  though it has not marketed its technology in the media, Blackbird has attracted millions of dollars of
7  funding, and it already has customers that are paying six-figure annual license fees for Blackbird's
8  innovative technology.

9  21. During the entire time it employed Defendant, Blackbird was operating in what is called
10 "stealth mode." No one knew about its technology other than its employees, investors, and customers.
11 Indeed, Blackbird asks potential hires to sign a non-disclosure agreement before it even discussed its
12 business in any detail. Blackbird competes in a space in which some of the best-known companies in the
13 world are doing research, and Blackbird did not want to disclose what it had accomplished. Even now,
14 Blackbird does not publicize its technology beyond investors and customers; it is focused on gaining a
15 foothold in the market.

**Defendant's Employment With Blackbird**

17 22. Defendant was employed by Blackbird from approximately July 2014 until February 28,
18 2015.

19 23. As a Blackbird employee, Defendant became intimately familiar with Blackbird's
20 technology and business plans. As described above, he was working on computer vision engineering and
21 reported directly to the CTO. During this time, Blackbird only presented its technology to one customer,
22 and Defendant was aware of that presentation.

23 24. As a condition of his employment with Blackbird, Defendant executed a PIIA, dated June
24 13, 2014, that states, in relevant sections:

25 • The following confirms and memorializes an agreement that Blackbird Technologies, Inc.,
26 a Delaware corporation (the "Company") and I ("Prateek Joshi") have had since the
27 commencement of my employment (which term, for the purposes of this agreement, shall
28 be deemed to include any relationship of service to the Company that I may have had

5
FIRST AMENDED COMPLAINT / CASE NO. 5:15-cv-04272-EJD

prior to actually becoming an employee) with the Company in any capacity, and that is and has been a material part of the consideration for my employment by Company. Lerner Decl. Supp. Pl.'s Ex Parte Appl. Extension TRO, Ex. H, PIIA at p. 1 (ECF No. 6-10).

- I agree that during the term of my employment with Company (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and I will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of the Company. *Id*. ¶ 6.

- Company shall own all right, title and interest . . . relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by me during the term of my employment with the Company to and only to the fullest extent allowed by California Labor Code Section 2870 . . . and I will promptly disclose all Inventions to Company. *Id*. ¶ 2.

- I agree that all Inventions and all other business, technical and financial information . . . I develop, learn or obtain during the term of my employment that relate to Company or the business or demonstrably anticipated business of Company or that are received by or for Company in confidence, constitute "Proprietary Information."  I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information. *Id*. ¶ 4.

- I agree that my obligations under paragraphs 2, 3, 4 and 5 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, . . . . *Id*. ¶ 8.

- I also understand that any breach of this Agreement will cause irreparable harm to Company for which damages would not be a adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in additional to any other remedies and without any requirement to post bond. *Id*. ¶ 9.

- I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION.  NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT.  I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT THE COMPANY WILL RETAIN ONE COUTNERPART AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.  *Id*. at p. 3.

**Defendant's Betrayal Of Blackbird**

25. Notwithstanding his contractual obligation not to compete with Blackbird, while working for Blackbird—and while he was collecting a six-figure salary from Blackbird—Defendant began preparations for a competing business that he originally called "Deep Lambda."

26. On September 20, 2014, while employed by Blackbird, Defendant registered the domain www.deeplambda.com.

27. On November 20, 2014, while still employed by Blackbird, knowing Blackbird was still in stealth mode, and notwithstanding his obligation to keep Blackbird's information in confidence, Defendant uploaded a video with a Deep Lambda logo to YouTube.  The video disclosed exactly what he was working on at Blackbird.  Indeed, the examples Defendant used in the video were almost word-for-word the same as the examples that Blackbird used in the only demonstration it had done for a customer. For example, Blackbird's presentation used the example of searching for "white shoes with black heels," and pointed out that the results are the same as if one searches for "black shoes with white heels." Defendant's video used the example of searching for "white shoes with black lace," and pointed out that the results are the same as if one searches for "black shoes with white lace."

28. Remarkably, the video creates the impression that the work represented in it was done by Defendant himself, not Blackbird.   Defendant, however, was not familiar with Blackbird's technology when he joined the company around July 2014.  Nonetheless, in the video, Defendant acts as though he came up with the same technology that it took Blackbird's multiple engineers more than two years to write.

29. Notwithstanding his contractual obligation to tell Blackbird about any work that he did

relating to Blackbird's business, Defendant never disclosed to Blackbird his separate venture, the YouTube video, or the work on a directly competitive project that he had purportedly done (at least as represented in the video). Defendant also kept secret his creation of code for his new venture, as well as his use of Blackbird's computer to write that code.

30. In January 2015, Blackbird told Defendant that his services were no longer needed. Blackbird did so because Defendant's work was not meeting expectations. In fact, Blackbird found it necessary to correct or rewrite nearly all of the code that Defendant had been tasked with writing for Blackbird.

31. Defendant, however, was not ready to leave. He asked for two additional months' time to allow him to deal with immigration issues. Specifically, he asked to remain an employee—and to continue to receive a reduced salary (still in six figures) and benefits—for two months so that he could, among other things, address immigration issues. Blackbird had no obligation to agree and, unaware that Defendant had been violating his PIIA, Blackbird granted Defendant's request paid him a reduced, but still six-figure salary annual for the next two months.

32. Defendant and Blackbird entered into a severance agreement dated January 5, 2015, pursuant to which Defendant agreed that he would remain bound by the PIIA. Defendant represented that he would return all property that belonged to the company, and he agreed to comply with Blackbird's policies and procedures. Defendant released claims against Blackbird. Unaware that Defendant was in violation of his representations, Blackbird also agreed to a contingent release. Defendant agreed that Blackbird's release of any claims against him was conditioned on his compliance with the agreement, including the obligations above. The last section before Defendant's signature stated: "I agree to the terms of this Agreement, and I am voluntarily signing this release of all claims. I acknowledge that I have read and understand this Agreement, and I cannot pursue any of the claims and right that I have waived in this Agreement at any time in the future."

33. Blackbird's contingent release, however, had no effect under the terms of the agreement because, as is now apparent, Defendant did not abide by any of the promises he made therein.

34. Blackbird never would have agreed to retain Defendant for an additional two months or to even a limited release of its claims against Defendant, had it known that Defendant was violating his

8
FIRST AMENDED COMPLAINT / CASE NO. 5:15-cv-04272-EJD

PIIA and deceiving Blackbird.

35. After he left Blackbird, Defendant created a URL redirect from deeplambda.com to plutosearch.com, a website that purports to offer search technology that is exactly the same as that offered by Blackbird. A URL redirect reroutes traffic from one website to another and further, if one types deeplambda.com into Google, the website for Pluto Search is displayed.

36. In addition to the code that he wrote for his new company while employed by Blackbird, Defendant also left with a copy of Blackbird's source code. He did not disclose that he was leaving with any of that code.

37. Blackbird's source code is a copyrightable work of creative expression. Specifically, the Blackbird's source code represents numerous creative choices made by Blackbird engineers about how to most effectively design and implement the visual semantic search, recommendation, personalization, and analytics technology that Blackbird provides its ecommerce customers.

## FIRST CAUSE OF ACTION
## (COPYRIGHT INFRINGEMENT)

38. Blackbird hereby alleges and incorporates by reference paragraphs 1-37 of this complaint, as if fully set forth herein.

39. Blackbird holds a valid copyright in its source code and training assets (the "Copyrighted Works").

40. The Copyright Office received a complete application for registration of the Copyrighted Works on October 13, 2015.

41. Blackbird has not granted Defendant a license with respect to the Copyrighted Works.

42. Defendant infringed Blackbird's exclusive rights granted by 17 U.S.C. §§ 106(1)-(2) by reproducing Copyrighted Works and preparing derivative works based on the Copyrighted Works.

43. As a result of Defendant's infringement, Blackbird has been harmed and Defendant has wrongfully profited.

## SECOND CAUSE OF ACTION
## (BREACH OF CONTRACT)

44. Blackbird hereby alleges and incorporates by reference paragraphs 1-43 of this

complaint, as if fully set forth herein.

45. Defendant executed the PIIA.

46. The PIIA prohibits Defendant from engaging in any activity that is in any way competitive with the business or demonstrably anticipated business of Company during Defendant's employment with Company.

47. The PIIA states that Blackbird owns all Inventions by Defendant, and prohibits Defendant from failing to disclose Inventions.

48. The PIIA states that Defendant shall hold Proprietary Information in confidence.

49. Defendant breached all of the foregoing provisions of the PIIA and more.

50. As evidenced by his securing the domain for www.deeplambda.com and uploading a video with the Deep Lambda logo, Defendant started (while employed by Blackbird) a business that competes directly with Blackbird.  He also used a Blackbird computer to write code for his competing venture while he was employed by Blackbird.

51. As evidenced by the YouTube video that he uploaded and the website for his business, Defendant either came up with ideas in precisely the same space that he was working on for Blackbird, or he simply took Blackbird's ideas.  Either way, he did not disclose any of this to Blackbird.

52. As evidenced by his use of nearly exactly the same confidential ideas that Blackbird presented to its customer, Defendant disclosed Blackbird's Proprietary Information.

53. Defendant also left Blackbird, taking with him the code that he wrote for his own venture as well as multiple copies of Blackbird's source code.

54. As a direct and proximate result of Defendant's breach of the PIIA, Blackbird has been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (BREACH OF DUTY OF LOYALTY)

55. Blackbird hereby alleges and incorporates by reference paragraphs 1-54 of this complaint, as if fully set forth herein.

56. By virtue of his employment with Blackbird, Defendant owed Blackbird a duty of loyalty.

57. Defendant breached this duty by, among other things, while employed by Blackbird,

failing to disclose his work in the same space as Blackbird, starting a competitive business, writing code for a competing business (and apparently using Blackbird's computer to do so), taking Blackbird's source code, and disclosing Blackbird's Proprietary Information.

58. As a direct result of Defendant's breach of his duty of loyalty, Blackbird has been damaged, and will continue to be damaged, in an amount to be proven at trial.

59. Defendant's breach of his duty of loyalty was accomplished in part through fraud, and was done with malice and oppression, thereby entitling Blackbird to an award of punitive damages.

## **FOURTH CAUSE OF ACTION**
### **(FRAUD)**

60. Blackbird hereby alleges and incorporates by reference paragraphs 1-59 of this complaint, as if fully set forth herein.

61. By virtue of his employment with Blackbird, Defendant owed Blackbird a duty of loyalty.

62. On January 5, 2015, when Plaintiffs informed Defendant that he would be terminated, Defendant asked to remain an employee—and to continue to receive a reduced salary (still in six figures) and benefits—for two months so that he could, among other things, address immigration issues. At that point, Defendant's breaches of the PIIA were not known to Blackbird—Defendant never disclosed that he had started another company, that he had uploaded a video of what he was working on at Blackbird, that he had written code for his new company while employed by Blackbird, or that he was leaving with a copy of Blackbird's source code.

63. Blackbird was not aware of Defendant's breaches of the PIIA until after he left Blackbird.

64. Defendant intended to deceive Blackbird. Defendant doubtless was aware that Blackbird would not have agreed to retain him for two additional months—or enter into any severance agreements—if Blackbird had known that he was breaching the PIIA.

65. Blackbird was harmed by Defendant's deceit—it not only lost the money it paid him, but also valuable time, during which Defendant was able to launch his business without Blackbird being able to assert its rights.

66. Defendant's deceit was a substantial factor in causing Blackbird's harm.

67. Defendant's deception of Blackbird was done with malice and oppression, thereby

1  entitling Blackbird to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Blackbird prays for the following relief:

    a.    Preliminary and permanent injunctive relief enjoining Defendant, as well as his agents, and all persons in active concert and participation with any of them, from, directly or indirectly, obtaining, accessing, using, retaining, or disclosing any of Blackbird's Proprietary Information;

    b.    Preliminary and permanent injunctive relief requiring Defendant to return of Blackbird's Proprietary Information—including Proprietary Information that Blackbird owns pursuant to the PIIA—in forensically sound fashion, preserving all metadata;

    c.    Preliminary and permanent injunctive relief requiring Defendant to refrain from selling any products, including any products offered by at www.plutosearch.com, that incorporate technology that Defendant worked on while employed by Blackbird or that incorporate technology that is derived from work that Defendant did while employed by Blackbird; and

    d.    A finding that Defendant has willfully infringed Blackbird's rights in its Copyrighted Works under 17 U.S.C. § 501;

    e.    Preliminary and permanent injunctive relief to prevent further infringement by Defendant of Blackbird's rights in its Copyrighted Works under 17 U.S.C. § 502.

    f.    Money damages and profits paid to Blackbird pursuant 17 U.S.C. § 504 for Defendant's copyright infringement;

    g.    An award of compensatory damages to Blackbird in an amount to be proven at trial for Defendant's breach of contract, breach of his duty of loyalty, and fraud;

    h.    Punitive damages against Defendant, pursuant to California Civil Code Section 3294;

    i.    Blackbird's reasonable attorneys' fees, costs, and expenses incurred in connection with this action;

    j.    Prejudgment interest on any monetary award made part of the judgment against Defendant;

    k.    All other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial of this action by a jury as to all issues triable by jury.

Dated:  October 14, 2015                    DURIE TANGRI LLP

                                    By:      */s/ Josh H. Lerner*
                                            RAGESH K. TANGRI
                                            MICHAEL H. PAGE
                                            JOSH H. LERNER
                                            JOHANNA CALABRIA
                                            ADAM BRAUSA

                                        Attorneys for Plaintiff
                                        BLACKBIRD TECHNOLOGIES, INC.

## CERTIFICATE OF SERVICE

    I hereby certify that on October 14, 2015 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following; that the document was served on the following counsel as indicated; and that the document is available for viewing and downloading from CM/ECF.

                                                        */s/ Josh H. Lerner*
                                                        JOSH H. LERNER